1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11   Gregory A. W.,                )    NO. ED CV 18-2011-E
                                    )
12             Plaintiff,           )
                                    )
13        v.                        )    **MEMORANDUM OPINION**
                                    )
14   NANCY A. BERRYHILL, DEPUTY     )    **AND ORDER OF REMAND**
     COMMISSIONER FOR OPERATIONS,   )
15   SOCIAL SECURITY,               )
                                    )
16             Defendant.           )
     _____)
17

18        Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS

19   HEREBY ORDERED that Plaintiff's and Defendant's motions for summary

20   judgment are denied, and this matter is remanded for further

21   administrative action consistent with this Opinion.

22

23                          **PROCEEDINGS**

24

25        Plaintiff filed a complaint on September 20, 2018, seeking review

26   of the Commissioner's denial of benefits.  The parties consented to

27   proceed before a United States Magistrate Judge on October 18, 2018.

28   Plaintiff filed a motion for summary judgment on February 1, 2019.

Defendant filed a motion for summary judgment on March 4, 2019.[1]  The

Court has taken the motions under submission without oral argument.

See L.R. 7-15; "Order," filed September 25, 2018.

**BACKGROUND**

Plaintiff, a former United States Navy Hospital Corpsman, asserts

disability since December 18, 2014, based on, inter alia, major

depressive disorder, anxiety, post traumatic stress disorder and

degenerative joint disease (Administrative Record ("A.R.") 77-78, 84-

86, 260).  An Administrative Law Judge ("ALJ") reviewed the record and

heard testimony from Plaintiff and a vocational expert (A.R. 10-23,

61-130).  Plaintiff testified to pain and limitations of allegedly

disabling severity (A.R. 83-104).[2]  The ALJ found that Plaintiff has

"severe" status post right tibial osteotomy, osteoarthritis of the

right knee, major depressive disorder (recurrent), bipolar disorder

and post traumatic stress disorder (A.R. 13).

---

[1]    Both motions for summary judgment exceed the ten-page
limit imposed by the Court in the "Order," filed September 25,
2018.  Both counsel shall heed the Court's orders in the future.

[2]    Plaintiff testified that he could not work because he
has physical limitations in lifting, bending, kneeling, and
sitting, claiming that he has a hard time just getting ready in
the morning and requires his wife's help with showering (A.R.
83).  Plaintiff said he has been unable to stand for more than a
few minutes without extreme pain ever since a September, 2015
high tibial osteotomy surgery (A.R. 92-93, 96).  Plaintiff said
his most comfortable position is sitting with his right leg
extended at waist level for up to 80 percent of the time he is
seated, which he has done for pain since the September, 2015
surgery (A.R. 93-94).  The vocational expert testified that if
someone were required to elevate the right leg to waist level
while seated, the requirement would eliminate all work (A.R. 128-
29).

The ALJ also found, however, that Plaintiff retains a residual functional capacity for light work, limited to: (1) standing and walking for two hours out of an eight-hour workday; (2) occasional climbing of ramps and stairs, balancing and stooping; (3) no climbing of ladders, ropes or scaffolds, and no kneeling, crouching or crawling; (4) no concentrated exposure to hazards, such as moving machinery or unprotected heights; and (5) simple, routine repetitive tasks. <u>See</u> A.R. 16-21 (adopting limitations similar to: (a) those found by non-examining state agency physicians at A.R. 131-65, except for (i) limits in pushing and pulling with the right lower extremity, (ii) extreme temperature limits, and (iii) limits in interacting with others; and (b) none to "mild" limitations found by the psychological consultative examiner, but not the greater limitations the examiner found). The ALJ deemed Plaintiff capable of performing work as a Cashier II, Small Products Assembler II, and bench assembler and, on that basis, denied disability benefits (A.R. 22-23 (adopting vocational expert testimony at A.R. 110-14)).

The Appeals Council denied review (A.R. 1-5).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. <u>See</u> <u>Carmickle v. Commissioner</u>, 533 F.3d 1155, 1159 (9th Cir. 2008); <u>Hoopai v. Astrue</u>, 499 F.3d 1071, 1074 (9th Cir. 2007); <u>see also</u> <u>Brewes v. Commissioner</u>,

682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.  But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

**DISCUSSION**

After consideration of the record as a whole, the Court reverses the Administration's decision in part and remands the matter for further administrative proceedings.  As discussed below, the Administration materially erred in evaluating the evidence of record.

///

///

///

///

///

I.    **Summary of the Relevant Medical Record**[3]


     Plaintiff was discharged from the Navy on December 18, 2014,
reportedly after being charged with driving under the influence of
alcohol in August of 2013 (A.R. 81, 252-53, 563).  Plaintiff asserts
disability starting the next day (A.R. 77-78).  The Department of
Veterans Affairs ("VA") issued a letter certifying that Plaintiff was
receiving 100 percent service-connected disability payments of a
certain sum as of December 1, 2017 (A.R. 317).  The letter does not
indicate how Plaintiff's disability was determined, or if December 1,
2017 was the first date the VA deemed Plaintiff disabled (A.R. 317).
The earliest VA medical record referencing Plaintiff's 100 percent
disability rating is dated March 3, 2015, and lists the following
rated disabilities:  major depressive disorder (50%), paralysis of
musculospiral nerve (30%), sinusitis (maxillary, chronic) (30%),
limited extension of knee (30%), migraine headaches (30%), stricture
of the urethra (20%), superficial scars (20%), lumbosacral or cervical
strain (10%), tinnitis (10%), knee condition (10%), superficial scars
(10%) and limited flexion of the knee (10%) (A.R. 971-72).  The
record, though lengthy, does not contain the VA ratings decision
itself or the report(s) on which the decision may have been based.


     The record does contain a later medical opinion from Dr. Candice
Barnett who reviewed Plaintiff's VA medical records, examined

_____

          [3]     Because Plaintiff's challenges to the ALJ's decision
focus on the ALJ's consideration of Plaintiff's alleged physical
limitations, the Court has not summarized the record regarding
Plaintiff's mental health treatment.

Plaintiff and completed VA Disability Benefits Questionnaires dated
April 15, 2015 (A.R. 997-1024).  Dr. Barnett found: (1) no evidence of
an ankle condition; (2) evidence that Plaintiff was treated for a back
condition consistent with lumbar strain during his service; (3) a
diagnosis of eczema from 2009 with no current lesions observed; and
(4) a diagnosis of urinary retention in October of 2013, which causes
urinary frequency every one to two hours in the daytime (A.R. 999-
1000, 1014, 1016-17, 1018-19).  On examination of Plaintiff's back,
Plaintiff reportedly had normal range of motion, no evidence of pain
on weight bearing, mild to moderate tenderness in the lumbar
paraspinal muscles, muscle spasm, local tenderness and guarding not
resulting in an abnormal gait or abnormal spinal contour, normal
strength in hip flexion, knee extension, ankle plantar flexion, ankle
dorsiflexion and great toe extension, no muscle atrophy, normal reflex
and sensory examination, negative straight leg raising testing, no
signs or symptoms of radiculopathy, no ankylosis and no neurological
abnormalities (A.R. 1001-04).  On examination of Plaintiff's ankles,
he reportedly had normal range of motion, no evidence of pain with
weight bearing, tenderness, or crepitus, normal muscle strength and no
atrophy or ankylosis (A.R. 1008-11).  Imaging showed no arthritis or
significant findings, and Plaintiff reportedly had no use of assistive
devices "as a normal mode of locomotion"  (A.R. 1004-05, 1011-12).

    Dr. Barnett opined Plaintiff's back condition and ankles would
have no functional impact on his ability to perform any occupational
tasks (standing, walking, lifting, sitting, etc.) (A.R. 1006, 1012).
Dr. Barnett recommended that Plaintiff file a claim for his "bilateral
feet condition" (unspecified) (A.R. 1012).  Dr. Barnett opined that

Plaintiff's eczema would impact his ability to work, stating, "Currently in school for nurse anesthetist. Plan on graduating 2020. ¶ He states sometimes its [sic] been hard to sit in car seat/truck seat to go to school. Itching rate 5/10." (A.R. 1017). Dr. Barrett opined that Plaintiff's bladder condition would impact his ability to work in that he would have to get up every one to two hours to urinate (A.R. 1021).

In late April of 2015, Plaintiff was referred to an orthopedic surgeon for a right knee meniscal tear, status post knee arthroscopy in 2004, 2005, 2007 and 2011 (A.R. 967). Plaintiff reported that his knee was locking and giving out (A.R. 967). He also reportedly had tried four steroid injections in the past two years, which had provided approximately six weeks of relief (A.R. 967). Plaintiff reportedly had undergone six months of physical therapy with minimal benefit (A.R. 967). Plaintiff was asked to bring his surgical records to his next appointment and was offered another steroid injection, which Plaintiff refused (A.R. 968).

On May 28, 2015, Plaintiff reported to his providers that morphine was "working perfect" for his pain (A.R. 1533). On June 2, 2015, Plaintiff was diagnosed with right knee arthritis and was fitted for a knee brace (A.R. 961). On June 13, 2015, Plaintiff presented to the emergency room because of a fall (A.R. 1524). On July 2, 2015, Plaintiff reportedly had no deficits in his functional status (i.e., he was ambulating independently, with a steady gait and no observed/reported muscle weakness or decreased range of motion) (A.R. 1517).

On July 6, 2015, Plaintiff had surgery for his right knee (i.e., diagnostic arthroscopy with medial meniscectomy and chondroplasty), which showed grade 4 chondromalacia of the medial tibia and femur (A.R. 1117-19, 1407). Plaintiff was ordered to begin weight-bearing as tolerated (A.R. 1118).

On July 27, 2015, Physician Assistant ("PA") Renee Wilterding reviewed the record and completed a Disability Benefits Questionnaire for Plaintiff's "knee and lower leg conditions" following his surgery (A.R. 1464-82). Reportedly, Plaintiff was still healing from his surgery and using a brace (A.R. 1470-71). The PA opined that Plaintiff would be limited to "sedentary employment" while recovering from knee surgery, and should avoid prolonged kneeling, squatting and climbing (A.R. 1472).

On September 30, 2015, Plaintiff had another right knee surgery (i.e., high tibial osteotomy with placement of titanium spacer and allograft bone graft (A.R. 855-58, 918-21, 926-32, 996-97, 1113-17). Plaintiff was ordered to remain non-weight-bearing on the right lower extremity for six weeks, with the use of a knee immobilizer (A.R. 1116; see also A.R. 1295 (October, 2015 treatment note re wheelchair use post-surgery)).[4] Plaintiff was discharged from the hospital on October 7, 2015, when he reportedly was able to walk with a "walking

---

[4]    An October, 2016 CT scan of Plaintiff's right lower extremity showed the hardware from the osteotomy in place, progressive but incomplete bone fusion at the osteotomy tract, progressive resorption of bone cement and bone chips at the osteotomy tract, and osteopenia (chronic grade 3-4 chondromalacia medical compartment as known, with small joint effusion) (A.R. 1121-22).

aid" (crutches) (A.R. 1300, 1302, 1308). At an October 19, 2015 follow-up appointment, Plaintiff was instructed to remain non-weight-bearing for three more weeks (A.R. 1297).

On October 29, 2015, Plaintiff was admitted to the hospital and treated for an infection to the surgical incision, and it was noted he was still non-weight-bearing on the right lower extremity (A.R. 1270-72, 1291, 1600-02, but see A.R. 1293 (noting no deficit in "functional status," i.e., ambulating independently, steady gait, no observed/reported muscle weakness or decreased range of motion and self care)). In November of 2015, Plaintiff transitioned from axillary crutches to a single forearm crutch (A.R. 585).

On December 15, 2015, Plaintiff started physical therapy following his tibial osteotomy (A.R. 335-39). Plaintiff reportedly had been wearing a brace and using crutches until approximately two weeks before the appointment, and reportedly was returning to work the following Monday at Lowes (A.R. 335).[5] On examination, Plaintiff's gait reportedly was antalgic, he had decreased lumbar and cervical lordosis, he had deep pitting edema, his right knee muscle strength was 3/5, and right ankle strength was 4/5 (A.R. 335-36). Plaintiff was advised to do physical therapy three times a week for four weeks for his right knee pain, ankle pain and edema (A.R. 336-37). Plantiff was discharged from physical therapy in June of 2016 (A.R. 413-23).
///

_____

[5]    It is unclear when, if ever, Plaintiff may have worked at Lowes. There is no record of any FICA earnings in 2015. See A.R. 248.

A treatment note from December 28, 2015, states that Plaintiff reported right ankle pain not correlated with clinical and MRI findings, which should have healed or improved with immobilization post knee surgery (A.R. 552-54). In January of 2016, Plaintiff reportedly was ambulating with one forearm crutch, with 4/5 motor strength in the right lower extremity (A.R. 537). His right foot had mild pitting edema and bluish discoloration (A.R. 537). At another appointment that same month, Plaintiff reportedly was ambulating with a limp favoring the right lower extremity, had 3/5 motor strength in the right lower extremity but also had an "independent" gait without a device (A.R. 543).

In a veteran caregiver assessment form dated April 6, 2016, it was reported that Plaintiff needed assistance with ambulation and transfers, bathing, and dressing, and was using a forearm crutch, knee brace and a wheelchair for long distances (A.R. 470-71). Reportedly, Plaintiff was not yet able to bear full weight on his right leg, and his gait was unsteady (A.R. 471). Plaintiff reportedly had undergone six knee surgeries, and his surgeon was trying to prevent Plaintiff from requiring a knee replacement (A.R. 477).

Plaintiff reportedly was ambulating with a cane later in April of 2016, when he presented for group psychology classes and examinations (A.R. 459-60, 463, 468). Plaintiff reportedly had functional impairments in his lumbar spine, as well as in his lower extremity range of motion, strength and endurance (A.R. 464). He reportedly was at high risk for falls (A.R. 464). Plaintiff was given a TENS unit and home alpha stimulator unit (A.R. 469).

On June 2, 2016, Plaintiff reportedly had an antalgic gait "without device," was ambulating with a cane (A.R. 417-18, 422). Plaintiff reportedly had 4/5 right lower extremity strength with pain (A.R. 418). Plaintiff's doctor requested aquatic physical therapy exercises for six weeks (A.R. 420). Plaintiff was taking morphine, oxycodone, and mobic daily in addition to clonazepam, which his doctors wanted to wean to safer dosages (A.R. 421-22, 434-35, 480).

Meanwhile, Plaintiff began complaining of a history of right ankle pain in April and May of 2016 (A.R. 430, 445-46, 457-58, 461-62). Plaintiff was treated with acupuncture in April and May of 2016 (A.R. 331-33, 341-42).

On June 9, 2016, Plaintiff was seen at Cactus Foot and Ankle for possible surgery for pain in his right ankle, which Plaintiff claimed had been present for more than one year (A.R. 326). On examination, Plaintiff reportedly had muscle strength of 5/5 in all ranges of motion, pain on palpation to the medial right ankle, pain in the flexor tendons of the medial ankle with significant crepitation, visible discoloration from the "chronic" injury, and pain on palpation to the tarsal tunnel region of the medial right foot and ankle (A.R. 326). An ultrasound reportedly showed hypoechoic signal to the flexor tendons of the right medial ankle consistent with synovitis and chronic tendon pathology (A.R. 326-27). Plaintiff was diagnosed with right ankle tendonitis, synovitis, limb pain, difficulty walking and tarsal tunnel syndrome, and surgical options were discussed (A.R. 327; see also A.R. 369-72, 376, 380 (December, 2015 right foot x-ray and May, 2016 right lower extremity MRI studies and x-ray)). Plaintiff

then was weaning off opioid medications and clonazepam at that time
(A.R. 400-03, 410-13).

On June 15, 2016, Plaintiff reportedly could walk over two blocks
(A.R. 408).  On June 30, 2016, Plaintiff notedly was ambulating with a
single point cane and had an antalgic gait (A.R. 401).

Plaintiff underwent right ankle tendon and tarsal tunnel surgery
on July 8, 2016 (A.R. 352-57).  Plaintiff was fitted with crutches and
given gait training in July of 2016 following his surgery (A.R. 398).
On July 11, 2016, Plaintiff reported great improvement compared to his
preoperative pain (A.R. 349).

On August 20, 2016, Plaintiff went to the emergency room for a
wound to his ankle that was not healing after his ankle surgery, at
which time he "ambulate[d] without difficulty" (A.R. 881-83, 1108,
1215).  Plaintiff followed up in September and October for additional
wound cleaning, and his gait reportedly was unassisted and steady
(A.R. 1030-32).

On September 15, 2016, Plaintiff apparently was ambulatory with
5/5 muscle strength (A.R. 1054).  However, Plaintiff reported that his
right knee was worse than it had been before the high tibial osteotomy
surgery (A.R. 1055).  Plaintiff's doctor recommended hardware removal
from the right tibia with diagnostic arthroscopy (A.R. 1055).

On November 28, 2016, Plaintiff apparently was ambulatory without
assistance (A.R. 2105).  On December 22, 2016, Plaintiff reportedly

was able to walk 30 minutes a day, five days a week (A.R. 2084).

On January 12, 2017, Plaintiff presented for treatment for leg and back pain, stating that he had tried bowling and had been having severe right knee pain for the past eight days (A.R. 1621).  On examination, he had mild swelling and reduced range of motion in full flexion of the right knee (A.R. 1623).  He was diagnosed with osteoarthritis of the right knee and low back pain (A.R. 1623).  On January 19, 2017, Plaintiff was given lumbar facet injections for back pain (A.R. 1873-74).

On January 26, 2017, Plaintiff reportedly had a normal gait, normal muscle strength, and no edema or tenderness (A.R. 1643).  On February 6, 2017, Plaintiff reportedly had normal range of motion in his right knee with no swelling, some tenderness and a normal gait (A.R. 1682).  On February 9, 2017, Plaintiff discussed his treatment options with his provider and expressed interest in a knee replacement (A.R. 1696).  Plaintiff said he had pain associated with walking, but could ambulate a few blocks with a cane (A.R. 1693).

On March 1, 2017, Plaintiff complained of right ankle pain and was diagnosed with right tarsal tunnel syndrome (A.R. 1707-09).[6]  A March 23, 2017 physical therapy treatment note reflected a goal of walking 15 minutes and doing more activities of daily living (A.R. 1741).  The therapist recommended a "kneeling walker" for walking outside (A.R. 1745).

_____

[6]     A March, 2017 right ankle x-ray assertedly showed right-sided plantar calcaneal spurring (A.R. 1711).

On March 28, 2017, Plaintiff presented for follow up and indicated that he was going to have his hardware from the osteotomy taken out in June (A.R. 1751). Apparently, Plaintiff then was taking six oxycodone a day for his pain (A.R. 1751). On examination, Plaintiff had an antalgic gait with a cane (A.R. 1754, 1860). Plaintiff reportedly lived with his wife and children and had been "disabled since 2014 due to back pain symptoms" (A.R. 1751).

On April 4, 2017, Plaintiff reportedly had 5/5 muscle strength in his lower extremities and a normal gait (A.R. 1767). On April 6, 2017, Plaintiff's doctor recommended giving Plaintiff stem cell injections in his right knee (A.R. 1902-03). On April 24, 2017, Plaintiff reportedly was independent with ambulation and activities of daily living, with a normal gait and 5/5 muscle strength (A.R. 3025).

Consultative examiner Dr. Rashin D'Angelo interviewed Plaintiff and prepared a "Mental Evaluation by Psychologist" dated April 18, 2017 (A.R. 1896-1900). Plaintiff was observed to walk with an unsteady gait with a cane (A.R. 1896). Dr. D'Angelo diagnosed post traumatic stress disorder (chronic) and bipolar disorder, and opined that Plaintiff would have no limitations performing simple and repetitive tasks, mild limitations in performing work on a consistent basis without special or additional supervision, mild limitations in accepting instructions from supervisors and interacting with coworkers and the public, moderate limitations in completing a normal workday or workweek due to his mental condition, and moderate limitations in handling the usual stresses, changes, and demands of work (A.R. 1899-1900). Dr. D'Angelo indicated that Plaintiff was adhering and

responding well to treatment, and predicted that Plaintiff' condition
would significantly improve with treatment (A.R. 1900).

On May 17, 2017, Plaintiff underwent a diagnostic athroscopy and
removal of the hardware in his right knee (A.R. 1845, 2018-21, 3506-
12). Prior to surgery, Plaintiff reportedly had no deficits in his
functional status (i.e., he was ambulating independently, with a
steady gait and no observed/reported muscle weakness or decreased
range of motion) (A.R. 1832; compare A.R. 1848-49 (caregiver
assessment dated May 5, 2017, where Plaintiff stated that he could
"barely move" on his own due to right knee and right ankle pain, and
that he needed assistance standing up and pivoting and with activities
of daily living)). Plaintiff was ordered to bear weight as tolerated
on the right lower extremity after surgery (A.R. 3509).

On June 19, 2017, Plaintiff reportedly had a normal gait and
normal range of motion to the right knee and no swelling, but some
tenderness (A.R. 1776). On August 29, 2017, Plaintiff indicated that
he was completely off of all narcotic pain medications, he had pain
with climbing stairs and his condition was worsening (A.R. 2203).[7]

On January 31, 2018, Plaintiff underwent a right knee open
osteochondral allograft, tibial plateau with allograft, and high

_____

[7] A December, 2017 CT scan of Plaintiff's right lower
extremity showed mild-to-moderate degenerative joint disease with
joint space narrowing involving the medial compartment of the
tibiofemoral joint and patellofemoral joint, mild lateral
displacement of the patella, and a small amount of effusion (A.R.
2176-77).

tibial osteotomy revision (A.R. 3491-3506).  Plaintiff was ordered to
remain non-weight-bearing with no range of motion for the first week
after surgery, and he could start 20 percent weight-bearing in
extension at four weeks after surgery if x-rays showed stability (A.R.
3494).  Plaintiff could start full weight-bearing as tolerated at
eight weeks post-surgery, if x-rays showed stability and appropriate
healing (A.R. 3495).

     State agency physicians reviewed the record in December of 2016
and May and August of 2017 and found, _inter alia_, that Plaintiff did
not meet Listing 1.03 (A.R. 131-65).  These physicians opined that
Plaintiff's most restrictive residual functional capacity was for
light work with standing and walking limited to two hours in an eight
hour day, limited pushing and pulling in the lower extremities due to
"OA" (osteoarthritis) in the right knee, with occasional postural
limitations except no climbing of ladders, ropes or scaffolds due to
right knee problems post surgery, some environmental limitations, and
some "moderate" mental limitations (A.R. 131-65 (describing these
limitations as "sedentary")).

     The record does not contain any opinion from a consultative
examiner regarding Plaintiff's physical condition.  At the
administrative hearing, Plaintiff's counsel requested that a medical
expert render an opinion regarding Plaintiff's knee impairment (A.R.
73-74, 127-28).  The ALJ denied the request (A.R. 11).

///

///

///

**II. <u>Substantial Evidence Does Not Support the ALJ's Residual
Functional Capacity Assessment.</u>**

On the present record, the ALJ's assessment of Plaintiff's
residual functional capacity is not supported by substantial evidence.
No medical opinion concurs with the ALJ's assessment. As summarized
above, the state agency physicians found greater limitations that the
ALJ found to exist, the only consultative examiner evaluated
Plaintiff's mental condition and found greater limitations than the
ALJ found to exist, and the VA concluded that Plaintiff was 100
percent disabled. <u>Compare</u> A.R. 16, 20-21 (ALJ only giving "partial
weight" to the opinions of the state agency physicians and the
psychological consultative examiner, and no weight to the VA
disability determination) <u>with</u> A.R. 140-45, 157-62 (state agency
physicians' opinions) and A.R. 1899-1900 (consultative examiner's
opinion). In so far deviating from the medical opinion of record, the
ALJ appears to have relied heavily on his own lay opinion to define
Plaintiff's functional capacity.

An ALJ cannot properly rely on the ALJ's own lay knowledge to
make medical interpretations of examination results or to determine
the severity of medically determinable impairments. <u>See</u> <u>Tackett v.
Apfel</u>, 180 F.3d 1094, 1102-03 (9th Cir. 1999); <u>Balsamo v. Chater</u>, 142
F.3d 75, 81 (2d Cir. 1998); <u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th
Cir. 1996); <u>Day v. Weinberger</u>, 522 F.2d 1154, 1156 (9th Cir. 1975).
Absent expert medical assistance, the ALJ could not competently
translate the medical evidence in this case into a residual functional
capacity assessment. <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d at 1102-03 (ALJ's

residual functional capacity assessment cannot stand in the absence of
evidentiary support); Rohan v. Chater, 98 F.3d at 970 ("ALJs must not
succumb to the temptation to play doctor and make their own
independent medical findings"); Day v. Weinberger, 522 F.2d at 1156
(an ALJ is forbidden from making his or her own medical assessment
beyond that demonstrated by the record).

Additionally, even if the ALJ had wished to adopt in whole the
opinions of the non-examining state agency physicians regarding
Plaintiff's physical limitations, the ALJ could not properly have done
so in the absence of other corroborating medical evidence.  See, e.g.,
Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995) (ALJ may not rely
solely on opinions of non-examining physicians); Erickson v. Shalala,
9 F.3d 813, 818 n.7 (9th Cir. 1993) (same).

To aid in assessing Plaintiff's physical limitations, the ALJ
should have ordered an examination and evaluation of Plaintiff by a
consultative specialist.  See Day v. Weinberger, 522 F.2d at 1156; see
also Reed v. Massanari, 270 F.3d 838, 843 (9th Cir. 2001) (where
available medical evidence is insufficient to determine the severity
of the claimant's impairment, the ALJ should order a consultative
examination by a specialist); accord Kish v. Colvin, 552 Fed. App'x
650 (2014); see generally Mayes v. Massanari, 276 F.3d 453, 459-60
(9th Cir. 2001) (ALJ's duty to develop the record further is triggered
"when there is ambiguous evidence or when the record is inadequate to
allow for the proper evaluation of the evidence") (citation omitted);
Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) ("[T]he ALJ has a
special duty to fully and fairly develop the record to assure the

claimant's interests are considered.  This duty exists even when the claimant is represented by counsel.").

The ALJ's failure to develop the record fully and fairly is especially apparent here, where the VA found Plaintiff 100 percent disabled but the record does not contain the VA's underlying analysis. An ALJ must always consider a VA rating of disability and must ordinarily accord "great weight" to such a rating.  McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002).  An ALJ may accord "less weight" to a VA rating of disability only if the ALJ "gives persuasive, specific, valid reasons for doing so that are supported by the record."  Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 694-95 (9th Cir. 2009) (quoting McCartey v. Massanari, 298 F.3d at 1076) (internal quotation marks omitted).

Here, the ALJ acknowledged that Plaintiff was receiving service-connected disability compensation as of December 1, 2017, based on a 100 percent disability rating (A.R. 20 (citing A.R. 317)).  However, the ALJ discounted the rating, stating only that "the VA uses different regulations and standards in analyzing disability that are not entirely consistent with the evaluation of disability under Social Security Administration regulations" (A.R. 20-21).  The ALJ's statement does not constitute the required "persuasive, specific, valid reason" for discounting a VA rating of disability.  See Berry v. Astrue, 622 F.3d 1228, 1236 (9th Cir. 2010) (fact that rules governing Social Security Administration and VA differ "is not a persuasive, specific, valid reason for discounting the VA determination") (brackets, internal quotation marks and citation omitted).  There is

no indication the ALJ attempted to obtain the actual ratings decision(s) the VA may have issued in finding Plaintiff disabled. There is no indication the ALJ sought clarification from Plaintiff's VA treatment providers regarding the bases for the VA decision.  Thus, the ALJ failed to discharge his duty to develop the record with respect to the VA disability rating.  See, e.g., Fino v. Berryhill, 728 Fed. App'x 775, 776 (9th Cir. 2018) (administrative decision reversed where ALJ failed to develop the record by attempting to obtain the report on which a VA ratings decision was based); Goodman v. Berryhill, 2017 WL 2610043, at *3 (W.D. Wash. June 16, 2017) (faulting the ALJ for failing to develop the record by attempting to obtain the VA "Rating Decision" itself).

### III. The Court is Unable to Deem the ALJ's Errors Harmless; Remand for Further Administrative Proceedings is Appropriate.

The Court is unable to conclude that the ALJ's errors were harmless.  See Treichler v. Commissioner, 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency"); see also Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error "is harmless where it is inconsequential to the ultimate non-disability determination") (citations and quotations omitted); McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (error not harmless where "the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error").

Remand is appropriate because the circumstances of this case suggest that further development of the record and further administrative review could remedy the ALJ's errors.  See McLeod v. Astrue, 640 F.3d at 888; see also INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation, except in rare circumstances); Leon v. Berryhill, 880 F.3d 1041, 1044 (9th Cir. 2017) (reversal with a directive for the immediate calculation of benefits is a "rare and prophylactic exception to the well-established ordinary remand rule"); Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits"); Treichler v. Commissioner, 775 F.3d at 1101 n.5 (remand for further administrative proceedings is the proper remedy "in all but the rarest cases"); Harman v. Apfel, 211 F.3d 1172, 1180-81 (9th Cir.), cert. denied, 531 U.S. 1038 (2000) (remand for further proceedings rather than for the immediate payment of benefits is appropriate where there are "sufficient unanswered questions in the record").  There remain significant unanswered questions in the present record.

///

///

///

///

///

///

///

///

**CONCLUSION**

For all of the foregoing reasons,[8] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: May 1, 2019.

_____/s/_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[8]   The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.